Filed 1/25/23  In re Serena P. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re SERENA P. et al., Persons Coming Under the Juvenile Court Law. | B315006 (Los Angeles County Super. Ct. No. 21CCJP02287AB) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSHUA P. et al.,<br><br>    Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robin R. Kesler, Juvenile Court Referee. Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant Joshua P.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant Jazmin R.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Adam Baumgarten, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Appellants Joshua P. (father) and Jazmin R. (mother) appeal from the juvenile court's dispositional order removing their children Serena (born 2017) and Shirley (born 2021) from father's custody because of domestic violence between the parents. We affirm the removal order.

## BACKGROUND

### Detention and section 300 petition

In April 2021, the Los Angeles County Department of Children and Family Services (the Department) received two referrals concerning domestic violence between the parents. According to the reporting party, on April 28, 2021, the parents were arguing while father was driving mother and the children on the freeway. Father was driving at an excessive rate of speed in order to scare mother. He eventually pulled over and stopped the car at mother's request. When father did so, mother took his phone. A physical struggle ensued, and father grabbed and twisted mother's left arm, causing her pain. Father then telephoned the paternal grandmother and asked her to pick him up.

2

Mother drove herself and the children to the family's home, where the paternal grandmother also resided. A physical altercation between mother and the paternal grandmother ensued, and mother punched the paternal grandmother in the face. Father stepped between the two women and pushed mother to the floor. While mother was on the floor, father got on top of her, placed one hand around mother's neck, and began to choke her. Father used his other hand to cover mother's nose and mouth to prevent her from breathing. Four-year-old Serena and infant Shirley were present during the incident. Serena attempted to intervene and told father to stop hitting mother. Father responded by pushing Serena, causing her to fall to the floor. The paternal grandmother yelled at father to stop choking mother, and father eventually complied. Mother called 911, and she and Serena were transported by ambulance to the hospital. Serena was uninjured, but mother sustained facial contusions and arm strain. According to the reporting party, mother disclosed a separate incident of domestic violence with father that had occurred shortly before Shirley was born. Father pushed mother and slapped her on the mouth. Father was arrested for the incident of April 28, 2021, and mother received an emergency protective order against him.

On May 4, 2021, the Department's social worker made an unannounced visit to the maternal grandparents' home, where mother and the children were staying. Mother told the social worker that she, the paternal grandmother, and father had been arguing on the day of the incident. The paternal grandmother had attempted to hit mother, and mother had raised her hand in self-defense. Father then tackled mother to the ground and began choking her with both hands. Four-year-old Serena was

present, crying and yelling at father to stop while hitting father on his back. Father turned and pushed Serena away, causing her to fall to the floor. Mother and the children had since moved out of the family home and were staying with the maternal grandparents. Mother reported that Serena was having nightmares since the incident, crying, "stop, stop, stop" in the middle of the night. Serena had also recently been wetting her bed.

Serena told the social worker that "Papi . . . pushed my mom and choked her." While describing the incident, Serena put her hands around her throat. She said, "I was hitting Papi on his back telling him to stop hurting my mom" when he "pushed my stomach and pushed me down." The child further stated, "when my daddy pushed me[,] I fell and hurt my finger."

The social worker spoke with father by telephone on May 5, 2021. Father denied the allegations and said he had been falsely accused, saying mother fabricated the allegations and no domestic violence had occurred. Father believed mother was coaching Serena to make false accusations against him. He denied choking mother or being physically violent with her. He acknowledged that mother fell but did not recall what happened. Father admitted he accidentally pushed Serena, which caused her to fall, but denied causing her any injury. Father then said he tripped over Serena while she was standing behind him, and he pushed Serena back, which caused the child to fall.

Father missed the children and said being separated from them was very difficult. Father admitted he was currently on probation for a DUI conviction and for soliciting prostitution. He believed his probation would be terminated in June 2021.

4

During a May 12, 2021 followup visit, the social worker informed mother that the Department was seeking a court order to remove the children from father's custody and to have the children remain in mother's custody. Mother became upset and said she had lied about the domestic violence incident. When the social worker told mother that Serena had corroborated mother's previous account, mother said Serena simply repeated whatever she had overheard mother say.

The Department filed a petition on behalf of the children under Welfare and Institutions Code section 300, subdivisions (a) and (b),[1] alleging an incident of domestic violence between the parents on April 28, 2021, and a physical altercation between mother and the paternal grandmother had occurred in the children's presence. Father pushed mother to the ground, got on top her, covered mother's nose and mouth, and choked her, preventing her from breathing. During the altercation, father pushed Serena, causing her to fall while she witnessed the domestic violence incident. The petition alleged that the parents' and the paternal grandmother's conduct endangered the children and placed them at risk of serious physical and emotional harm.

In a last minute information for the court filed on May 19, 2021, the Department reported that the social worker re-interviewed Serena separately from mother on May 17, 2021. Serena reiterated that on the day of the referral, father had pushed mother to the floor, got on top of her and began choking her. Serena said she yelled at father to stop. Father in turn told Serena to tell mother to stop. Serena said father pushed her,

---

[1]     All further statutory references are to the Welfare and Institutions Code.

causing her to hurt her finger.  She denied that anyone had instructed her to say these things.

The social worker also re-interviewed mother that same day.  Mother continued to deny that any domestic violence had occurred and insisted she had fabricated the incident.

The social worker also spoke with the maternal grandfather who said he knew that an incident had occurred between the parents, fueled by the paternal grandmother.  He did not know much about the incident or whether mother was covering up for father or trying to protect him.  He said he did not believe Serena was lying about the domestic violence incident.

Both parents were present at the May 19, 2021 detention hearing and denied the allegations of the petition.  The juvenile court found a prima facie case that the children were persons described by section 300 and ordered them detained from father and released to mother.  The court granted father a minimum of three visits per week with the children for three hours per visit and ordered mother not to serve as the monitor.

**Jurisdiction and disposition**

In its September 8, 2021 jurisdiction/disposition report, the Department reported that its dependency investigator had again interviewed Serena on July 15, 2021.  Serena told the investigator that on the day of incident, mother pushed father while they were inside the car because father had grabbed mother's arm and twisted it.  Father got out of the car, and mother drove away.  When mother and the children returned home, mother and the paternal grandmother fought, and father pushed mother to the floor, placed one hand on mother's throat, and used his other hand to cover mother's mouth.  Father then used a closed fist to hit mother on the stomach and on the arm.

6

Serena was crying and asked father to stop. Father pushed Serena to the floor, causing her to hurt her finger. When asked if anyone had asked her to lie about the incident, Serena responded, "My mom told me to tell people that I don't know or remember what happened between them. I told my mom that I do remember. I saw that my dad pushed and hit my mom with his hands."

Mother told the dependency investigator that on the day of incident, she and father had been arguing while father was driving the car. Mother told him to get out of the car, and mother then drove away. Mother said she lied about father twisting her arm while they were in the car. Father was in the home when mother and the children returned. Mother and the paternal grandmother argued, and a physical altercation ensued between the two women. Father moved between them and grabbed mother by the shoulders. Serena entered the room, bumped into father and fell to floor. Mother said she called 911 and lied to the operator about father choking her because mother was angry with him. Mother said she fabricated the entire incident. When asked about Serena's version of the incident, mother stated that the child lies and is aggressive with other children.

Mother and father both reported that they are legally married to one another. Mother said she intended to co-parent the children with father but was unsure whether she would get back together with him. Father said he did not know whether he would continue his relationship with mother.

The maternal grandmother told the investigator that mother had disclosed only that father had grabbed her by the arm. Mother did not say that father had hit or choked her. The maternal grandmother further stated that the parents had

previously lived in her home, and she had never observed any verbal or physical altercations between them.  The maternal grandmother expressed her willingness to monitor father's visits with the children.  She said Serena cries all the time for father.

**Adjudication hearing**

At the September 8, 2021 adjudication hearing, the children's counsel asked the juvenile court to give the most weight to Serena's statements, which remained consistent throughout the case.  Both the children's counsel and counsel for the Department asked the court to sustain the petition in full.

Counsel for both mother and father argued that the petition should be dismissed on the grounds that the incident was an isolated one, the parents were separated and were participating in services, and there was no current risk of harm to the children.

The juvenile court sustained the petition as alleged, noting that Serena was "very credible" and that mother's denials were not, given that she and Serena were both transported to the hospital.

As to disposition, the children's counsel joined in the Department's recommendation that the children be removed from father's custody and released to mother.  Mother submitted on the recommendation that the children be released to her.

Father's counsel pointed out that the parents had remained separated since the detention hearing, that father was enrolled in a 52-week domestic violence program and therapy and had nearly completed a parenting class.  Counsel argued that safety measures could be put into place to prevent removal and asked that the children be returned to father's custody on the condition

that father and mother continue to live apart from each other until further court order.

The juvenile court ordered the children removed from father's custody and to remain in mother's home under the Department's supervision. The court noted that "[f]ather has yet to understand the consequences associated with his domestic violence towards, not only the mother but the effects on the children. . . . Father's willingness to push his four-year-old daughter away while he's assaulting the mother puts these children at risk. He has yet to indicate that he even has any idea [of] that or accept any responsibility for the violence that occurred that day."

The court granted family maintenance services for mother and enhancement services for father. The court ordered father's visits to remain monitored pursuant to a written visitation schedule but gave the Department discretion to liberalize the visits. The juvenile court advised the parents that they could remain together as a couple but could not live together until they were further along in their programs and could admit to the events that occurred and take responsibility for their actions.

This appeal followed.

## DISCUSSION

### I.   Applicable law and standard of review

Section 361 authorizes the removal of a child from a parent's physical custody if the juvenile court finds that a substantial danger exists to the child's physical or emotional well-being: "A dependent child shall not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence . . . [¶] [t]here is or

would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . custody." (§ 361, subd. (c)(1).)

A removal order must be based on proof of parental inability to properly care for the child and of a potential detriment to the child; however, the parent need not be dangerous, and the minor need not actually be harmed before removal is appropriate. (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.) Instead, the statute focuses on averting harm to the child. (*Id.* at p. 170.) The juvenile court may consider a parent's past conduct as well as present circumstances. (*Ibid.*; *In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

When reviewing a juvenile court's removal order, an appellate court must account for the clear and convincing evidence standard required for removal under section 361. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 (*O.B.*).) The relevant question when reviewing a finding of fact under this standard "is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Ibid.*) When undertaking this inquiry, the appellate court must "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 1011-1012.)

## II.    Substantial evidence supports the removal order

Substantial evidence supports the juvenile court's finding that father's domestic violence against mother presented a substantial danger to the children's physical and emotional well-being.  The severity of father's April 28, 2021 attacks on mother in the children's presence; the children's tender ages; Serena's attempted intervention on mother's behalf; and father's response by pushing Serena, causing her to fall backward and hurt her finger, amply support a finding of high probability of harm to the children.  (*O.B., supra*, 9 Cal.5th at p. 1005.)  Earlier that same day, father had grabbed and twisted mother's arm in the children's presence while the family was in a car.  Mother's disclosure at the outset of the case that father had pushed and slapped her while she was pregnant with Shirley, indicates a history of domestic violence between the parents and contradicts the parents' assertion that the April 28, 2021 incident was an isolated one.

*In re I.R.* (2021) 61 Cal.App.5th 510, on which father relies, is distinguishable.  The appellate court in that case reversed a removal order based solely on domestic violence between the parents after concluding that the nature and frequency of the domestic violence incidents in the presence of their 11-year-old and nearly two-year-old children—two instances in which father slapped mother, the second of which also involved him throwing a baby shoe at her—did not support a reasonable inference that father was a generally violent or abusive person.  (*Id.* at p. 521.)  Here, in contrast, Serena described father choking and attempting to asphyxiate mother and using a closed fist to hit mother on the stomach.  When four-year-old Serena attempted to intervene, father shoved her, causing the child to fall and hurt

11

her finger.  Father did not stop choking mother until the paternal grandmother intervened.  Mother and Serena were both transported by ambulance to the hospital.

The parents' denial and minimization of the seriousness of the domestic violence is an added concern because "[o]ne cannot correct a problem one fails to acknowledge."  (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)  The parents' denial of the domestic violence makes them less open to the "treatment necessary to effect behavioral changes to [e]nsure the [children] will not be [at] risk if placed in [father's] custody."  (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044; see *In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["'[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision.'"].)

Father argues that his participation in domestic violence and parenting programs shows that he is willing to take responsibility for his actions.  Father's participation in the court's case plan is a positive sign.  But real change takes time.  The juvenile court did not err in concluding that father's efforts had not yet ripened into real change.

Father next contends that less drastic alternatives exist to removing the children from his custody and that neither the juvenile court nor the Department considered these alternatives. He argues that, even though he and mother are already currently separated, the juvenile court ordered the parents to live apart and ordered unannounced home inspections by a monitor or the Department.  Father claims that conditioning his custody of the children on these conditions was an available alternative to removal.  Father's counsel raised these alternatives at the disposition hearing.  The juvenile court considered and rejected

12

them, noting that the parents needed to make further progress in their case plans before the children could be returned to father's custody. Father and mother fail to establish any abuse of discretion in the juvenile court's dispositional order.

## DISPOSITION

The order removing the children from father's custody is affirmed.

_____
CHAVEZ, J.

We concur:

_____          _____
LUI, P. J.                                          BENKE, J.*

---

\*       Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.